IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Tiffany Bingham, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CV 7425 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| Premier Security Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Defendant Premier has moved for summary judgment. While the case is close, the court concludes that summary judgment is inappropriate.

The following facts are undisputed unless otherwise indicated and are taken in large part from the defendant's Summary of the Facts in its Memorandum in Support of its Motion for Summary Judgment.

Plaintiff Tiffany Bingham was employed as a private security officer for defendant Premier Security Corporation from May 2008 until January 2009. Plaintiff worked at Prudential Plaza in downtown Chicago, reporting to Assistant Director Victor Flanagan, who in turn reported to Director Randall Thomas.

On or about December 16, 2008, Bingham lodged a complaint of sexual harassment against Thomas and Flanagan with Premier's Human Resources representatives, Paula Hickey and Renee Brainerd-Doan. Bingham complained that shortly after she began working at Prudential Plaza, she began a consensual sexual relationship with Thomas. At the same time, she claimed, she was being sexually harassed by Flanagan. Bingham told Hickey and Brainerd-

1

Doan that she complained to Thomas about Flanagan's conduct but Thomas refused to address the issue and told Bingham that if she complained to Human Resources, Human Resources would believe Thomas and Flanagan and plaintiff would get into trouble. Plaintiff told the Human Resources representatives that she had been trying to end the consensual relationship with Thomas, but he had become jealous and obsessive, in ways that were interfering with their work.

Hickey and Brainerd-Doan commenced an investigation into Bingham's complaints. On or about January 5, 2009, they met with Premier's COO, Tony Simmons, and Premier's President, James Taff. Hickey and Brainerd-Doan recommended that Thomas be terminated (due to a lack of judgment and a lack of candor during the investigation), that Flanagan receive a final written warning for inappropriate conduct directed toward Bingham and that Bingham receive a final written warning for violating Premier's electronic communication policy, it having been revealed in the investigation that Bingham had sent sexually explicit pictures of herself to Thomas over the internet. Taff initially disagreed with the recommendations, believing that Thomas and plaintiff should be treated equally–either both terminated or both issued written warnings. In a subsequent meeting with Simmons, Taff reiterated his concern that a termination was too harsh for Thomas, and that he and plaintiff should be treated equally. Simmons made the decision to follow Hickey's and Brainerd-Doan's recommendations.

After the meeting, Hickey prepared a termination notice for Thomas and written warnings for Flanagan and Bingham. Simmons and Taff met with Prudential Plaza's management and told them that Thomas would not be returning to work but that Flanagan and Bingham would both return, with Flanagan temporarily assuming Thomas' duties.

At or about 3 p.m. on January 5,[1] Hickey met with plaintiff, telling her that Thomas had been terminated, that Flanagan was being counseled and receiving a final written warning and that plaintiff was also receiving a final written warning for sending sexually explicit pictures of herself to Thomas. Plaintiff was further told that when she returned to work, she would be reporting to Flanagan, who would temporarily replace Thomas. Upon being given this information, particularly the information that she was expected to return to work reporting to Flanagan (whom she had complained had sexually harassed her), plaintiff became upset and indicated that she wanted to speak to her lawyer. At some time during this meeting plaintiff signed her disciplinary action. The rest of what occurred is disputed.

According to Hickey, plaintiff responded that she did not want to report to Flanagan. Hickey told her that she could request a transfer but she might or might not receive one. Plaintiff said that she needed to talk to her attorney, and Hickey gave her a brief time to do so. (Hickey 57.) According to Hickey, plaintiff then asked what Premier was offering her, and when Hickey told her nothing, "her demeanor changed. She got very upset. She folded up the paper [Hickey had given her a piece of paper at Bingham's request on which Bingham was taking notes] and said, 'I don't want a transfer. I don't want to report to Vic and I'm going to have to resign.'" (Hickey 57-58.) Hickey testified that plaintiff turned down her offer of time to consider what she wanted to do and insisted that she was resigning on the spot. Hickey testified that she didn't want plaintiff to resign and repeatedly suggested that plaintiff take time to think about her decision. Plaintiff insisted on resigning.

---

[1] The witnesses are not consistent about the time or date of this meeting, with some witnesses putting it on January 6. The January 5 time and date comes from Hickey's testimony, and seems most consistent with the rest of the evidence. (Hickey 63.)

According to plaintiff, things transpired differently. Plaintiff testified that she was ready to return to work until Hickey informed her that she would be reporting to Flanagan, at which point plaintiff said, "I didn't see how that was right, being that he sexually harassed me and that I would need to talk to an attorney." (Bingham 42.) Hickey, according to plaintiff, gave her a day to do so. Plaintiff emphatically denied that she ever resigned, although she admits that there was some discussion of what she should do if, after speaking with an attorney, she decided to leave the company. Plaintiff testified that she left the meeting, shortly thereafter spoke with an attorney and decided to return to work.

It appears undisputed that after her meeting with plaintiff, Hickey reported to Simmons that plaintiff had resigned. Simmons then instructed to Taff to inform Prudential Plaza that there had been another change–the shift manager had resigned.

Hickey and plaintiff agree that on the following day, sometime in the morning (Hickey was at Prudential Plaza talking to Flanagan), plaintiff left Hickey a voicemail stating that she had spoken to her attorney and wished to return to work at Prudential Plaza. Hickey testified that upon listening to the voicemail, she went to Tony Simmons and told him that Bingham wanted to rescind her resignation. Simmons told Hickey that since the client had already been told that Bingham would not be returning, Bingham should be told to send in something in writing and it would be reviewed. Hickey testified that at a time the evidence establishes was 12:42 p.m. on January 6, she called Bingham back and told Bingham that she was confused by the voicemail since Bingham had resigned. Following Simmons' direction, Hickey told plaintiff that the client had already been notified that she would not be returning to work, that steps had already been taken to replace her and she should put something in writing stating that she wished to rescind

4

her resignation.

The evidence is undisputed that, in response to plaintiff's sexual harassment complaint, Premier's management made a decision on January 5 not to fire plaintiff. Hickey went into her January 5 meeting with plaintiff with a notice of termination for Thomas and a written warning for plaintiff. Nevertheless, plaintiff ended up losing her job. Premier argues that plaintiff has no plausible theory by which she could prevail, and for this reason, summary judgment should be granted in Premier's favor. The court agrees that there is a great deal of evidence supporting Premier's account, and plaintiff's case is far from overwhelming. Nevertheless, there is evidence which leads this court to believe that granting judgment in favor of Premier is unwarranted. The material issue of whether or not plaintiff resigned is disputed, and the court believes there is enough evidence to support an alternative, minimally plausible narrative which could causally link plaintiff's sexual harassment complaint with her loss of her job.

According to Hickey, after the January 5, 3 p.m. meeting at which plaintiff resigned, Hickey immediately reported plaintiff's resignation to Simmons. Simmons then spoke to Taff and told him to make the client aware of "yet another change in the management structure" and begin taking steps to replace Bingham. (Simmons 26.) No time was specified for this Simmons-Taff conversation, but Taff testified that he communicated Bingham's resignation to John King of Prudential Plaza at 4 or 5 p.m. on a date he believes was January 5. (Taff 25-26.) [2]

---

[2] Whether Taff was the first or only person to inform Prudential of Bingham's departure is uncertain. Taff testified that he informed King that plaintiff had resigned, he believes for the first time. (Taff 27.) Flanagan testified that after he spoke with Hickey (it appears that this occurred on the morning of January 6), he let BentleyForbes (the manager of the Prudential Plaza property) "know that we were down one shift manager." (Flanagan 23.) Flanagan testified that his conversation with BentleyForbes might have occurred on the day Hickey told him that Bingham had resigned [January 6] or on the next day. (Flanagan 23, 27-28.) Flanagan does not

5

Beyond the possibility that Taff spoke to Prudential late in the afternoon of January 5, there is no evidence that anything of consequence was done to fill plaintiff's position between the afternoon of January 5 and the 12:42 p.m. conversation between Hickey and plaintiff on January 6. The only thing that may have occurred is that Hickey may have notified Premier's internal recruiting personnel of the vacancy. There is no evidence that the job was posted or that any other efforts were made to fill it.

Indeed, at the time Hickey called plaintiff back on January 6, it is unclear that any steps had been taken to replace plaintiff. Simmons, who told Hickey that the client had already been notified, actually had no information that that had in fact occurred. (Simmons 28.) Even if a jury were to find that Hickey honestly believed that plaintiff had resigned on January 5 (either because plaintiff did resign or that Hickey mistakenly believed she had), it is far from clear that Premier did anything in reliance on plaintiff's resignation–anything, that is, that would have prevented it from allowing her to return to work. And yet, the evidence is clear that Simmons' reaction to the news that plaintiff wanted her job back was that giving her her job back was impossible because of all Premier had already done to replace her.

Premier's reluctance to tell Prudential Plaza, assuming it believed that Bingham had resigned, that Bingham was coming back to work is, as a business justification for Premier's treatment of plaintiff, entirely subjective; there is no objective reason why Premier couldn't tell Prudential honestly that there had been some confusion about what plaintiff wished to do. Further, and of more importance, the record is replete with indications that Prudential didn't care

---

recall whether or not he told anyone at Premier he had spoken to King about Bingham. (Flanagan 27.)

about whether Bingham, a low level shift manager, was returning to work or not. Bingham had been on leave for at least two weeks while the investigation was ongoing so Prudential could not have been relying on her presence. Further, Premier's normal practice was to inform the client only of personnel actions involving senior level management; a disciplinary matter involving a shift manager was not the kind of matter that Premier would typically take to the client. (Simmons 18.) And consistent with this testimony, Taff testified that when he informed John King of plaintiff's resignation, he was "indifferent." (Taff 28.) Thomas was Premier's senior man on the scene. His termination was obviously a matter of concern to the client. Flanagan was replacing him as senior man on the team; it is easy to understand why that information would be of significance to Prudential. But plaintiff was not senior management, she had not been working at Prudential for a number of weeks and Prudential reacted to the news of her resignation with indifference. A jury could find that Premier's expressed reason for refusing to allow plaintiff to return to work–that it had done too much (including telling Prudential Plaza) in reliance on her resignation–was neither honestly believed nor credible, regardless of whether Hickey or plaintiff was believed as to what transpired between them on January 5.

Premier argues that plaintiff's contention that retaliatory animus was at work is implausible. The court agrees that as Premier sees the facts, they are right. But the facts can be viewed differently. Against the outspoken judgment of Taff, Premier decided to fire Thomas and warn plaintiff, but plaintiff was being disciplined and required to return to work for her harasser (who was getting a warning but otherwise appeared to be getting at least a temporary promotion). Instead of taking this information gracefully, plaintiff became angry and insisted on speaking to a lawyer. She was so angry that she either resigned or at least brought up the subject

7

of not returning to work. It would not be entirely unreasonable for an employer, faced with an angry employee whom one senior manager believed should have been terminated, to rethink its decision to put plaintiff back to work. Premier thought in not firing plaintiff it was doing plaintiff a favor. Plaintiff returned the favor with anger and a bad attitude. Whether plaintiff actually resigned on January 5 as Hickey testified or took the night to speak to a lawyer without having resigned, as plaintiff testified, is a dispute which the jury must resolve. A finding that plaintiff was unjustifiably barred from returning to work is not totally implausible on these facts, even if this court believes that Premier appears to have the better of the story.

        Premier's motion for summary judgment is therefore denied.

                                  ENTER:

                                  /s/
                                JOAN B. GOTTSCHALL
                                United States District Judge

DATED: March 21, 2012